**PROPOSED REDACTED**

ORIGINAL

FILED

JUL - 1 2015

U.S. COURT OF
FEDERAL CLAIMS

*FILED UNDER SEAL*

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

### BID PROTEST

FILED UNDER SEAL

|  |  |  |
|---|---|---|
| **TRANSATLANTIC LINES, LLC** | ) | 15-689 C |
| Plaintiff, | ) | Case No._____ |
| v. | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | Judge: _____ |
| Defendant. | ) | Proposed Redacted Version |

## PLAINTIFF TRANSATLANTIC LINES, LLC's MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

I.    QUESTION PRESENTED ...................................................................................... 1

II.   STATEMENT OF THE CASE ............................................................................... 1

    A.    Introduction ................................................................................................... 1

    B.    Statement of Facts ........................................................................................ 4

        1.    Solicitation Overview ......................................................................... 4

        2.    The Solicitation's Evaluation Factors and Evaluation Process ................... 4

        3.    Technical Capability Evaluation Under the Solicitation ............................ 6

        4.    Schuyler's Non-Compliant Technical Proposal ....................................... 7

        5.    TRANSCOM's Flawed Evaluation Process ............................................. 9

        6.    TransAtlantic's GAO Bid Protest ......................................................... 10

        7.    Prejudice and Irreparable Harm Due To TRANSCOM's Actions ............ 11

III.  ARGUMENT ........................................................................................................ 12

    A.    TransAtlantic is Entitled to a Preliminary Injunction ............................. 13

        1.    TransAtlantic Will Likely Succeed on the Merits Because
             TRANSCOM's Evaluation of Schuyler's Proposal Ignored Express
             Requirements of the Solicitation ............................................................... 14

             a.    TRANSCOM failed to adhere to the terms of the
                    Solicitation when evaluating Schuyler's proposal ................ 15

             b.    TRANSCOM's Evaluation of Schuyler's Proposal Was
                    Contrary to Law ................................................................... 20

             c.    TransAtlantic Suffered Prejudice By TRANSCOM's
                    Arbitrary and Capricious  Evaluation of Schuyler's
                    Proposal ................................................................................ 21

        2.    TransAtlantic Will Suffer Irreparable Harm If It Is Denied the
              Contract Award ....................................................................................... 22

        3.    The Harm to TransAtlantic Outweighs Any Potential Harm to
              TRANSCOM or Schuyler ....................................................................... 24

       4.     Granting Injunctive Relief Is Strongly In the Public Interest ....................26

   B.   No Bond Is Warranted .........................................................................................27

IV.  CONCLUSION...........................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008).............................................................13

*Advanced Data Concepts, Inc. v. United States*,
    216 F.3d 1054 (Fed. Cir. 2000).............................................................14

*AFGE, Local 1482 v. United States*,
    258 F.3d 1294 (Fed. Cir. 2004).............................................................13

*Alabama Aircraft Indus.. Inc. v. United States*,
    586 F.3d 1372 (Fed. Cir. 2009).............................................................14

*Alfa Laval Separation, Inc. v. United States*,
    175 F.3d 1365 (Fed. Cir. 1999).............................................................15

*Allen M. Campbell Co. v. United States*,
    467 F.2d 931 (Ct. Cl. 1972) (Nichols, J., concurring) .............................27

*Bannum, Inc. v. United States*,
    404 F.3d 1346 (Fed. Cir. 2005).............................................................14

*BayFirst Solutions, LLC v. United States*,
    102 Fed.Cl.............................................................................................23

*BINL, Inc. v. United States*,
    106 Fed.Cl.............................................................................................23

*Caddell Constr. Co. v. United States*,
    111 Fed. Cl. 49 (2013) .........................................................................21

*Centech Group, Inc. v. United States*,
    554 F.3d 1029 (Fed. Cir. 2009).............................................................14

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971).............................................................................15

*CSE Constr. Co. v. United States*,
    58 Fed. Cl. 230 (2003) .........................................................................20

*Day & Zimmerman Servs. v. United States*,
    38 Fed. Cl. 591 (1997) .........................................................................26

*Femme Comp Inc. v. United States*,
   83 Fed. Cl. 704 (2008) ...............................................................................................26

*FMC Corp. v. United States*,
   3 F.3d 424 (Fed. Cir. 1993) .......................................................................................13

*Furniture by Thurston v. United States*,
   103 Fed.Cl. 505 (2012) ..............................................................................................23

*Gentex Corp. v. United States*,
   58 Fed. Cl. 634 (2003) ...............................................................................................24

*Great Lakes Dredge & Dock Co. v. United States*,
   60 Fed. Cl. 350 (2004) ...............................................................................................15

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
   238 F.3d 1324 (Fed. Cir. 2001)..................................................................................14

*J & H Reinforcing & Structural Erectors, Inc. v. United States*,
   50 Fed. Cl. 570 (2001) ...............................................................................................24

*Lab. Corp. of Am. Holdings v. United States*,
   116 Fed. Cl. 643 (2014) .............................................................................................13

*Lion Raisins, Inc. v. United States*,
   52 Fed. Cl. 115 (2002) ...............................................................................................24

*Magnavox Elec. Sys. Co. v. United States*,
   26 Cl. Ct. 1373 (1992), *aff'd*, 194 F.3d 1335 (Fed Cir. 1999)............................23, 24

*Mangi Envtl. Grp., Inc. v. United States*,
   47 Fed. Cl. 10 (2000) ............................................................................................15, 22

*Minor Metals v. United States*,
   38 Fed. Cl. 16 (1997) .................................................................................................26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)......................................................................................................14

*MVM, Inc. v. United States*,
   46 Fed. Cl. 137 (1999) ..........................................................................................24, 26

*Overstreet Elec. Co. v. United States*,
   47 Fed. Cl. 728 (2000) ...............................................................................................24

*PGBA, L.L.C. v. United States*,
   57 Fed. Cl. 655 (2003), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).................................23

*Red River Holdings, LLC v. United States,*
    87 Fed. Cl. 768 (2009) ............................................................22

*Seattle Sec. Servs. v. United States,*
    45 Fed. Cl. 560 (1999) ............................................................24

*Sheridan Corp. v. United States,*
    95 Fed. Cl. 141 (2010) ............................................................13

*TRW Envtl. Safety Sys., Inc. v. United States,*
    18 Cl. Ct. 33 (1989) ............................................................24

*United Int'l Investigative Servs. v. United States,*
    41 Fed. Cl. 312 (1998) ............................................................22

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ............................................................13

*Weeks Marine, Inc. v. United States,*
    575 F.3d 1352 (Fed. Cir. 2009) ............................................................14

*Wetsel-Oviatt Lumber Co. v. United States,*
    43 Fed. Cl. 748 (1999) ............................................................24

**Statutes**

5 U.S.C. § 706(2)(A) ............................................................4, 14

10 U.S.C. § 2305(b)(1) ............................................................4, 20, 21

28 U.S.C. § 1491(b)(1) ............................................................12, 13

28 U.S.C. § 1491(b)(4) ............................................................4, 14

31 U.S.C. § 3553(c)(1) ............................................................10

28 U.S.C. § 1491(b) ............................................................1, 13

**Other Authorities**

48 C.F.R. § 15.305(a) ............................................................20

48 C.F.R. § 33.104(c) ............................................................10

GAO Decision, B-411242 ............................................................11

Kendall, Lane C., *The Business of Shipping* (1973) ............................................................3, 4, 11, 19

**TABLE OF EXHIBITS**

Exhibit 1   Kendall, Lane C., *The Business of Shipping* (1973)

Exhibit 2   Solicitation HTC711-14-R-W001

Exhibit 3   Performance Work Statement

Exhibit 4   Schuyler's Proposal, Oct. 15, 2014

Exhibit 5    GAO Protest No. B-411242, Mar. 16, 2015

Exhibit 6   GAO Protest No. B-411242.2, Apr. 27, 2015

Exhibit 7   GAO Decision, B-411242; B-411242.2, June 23, 2015

Exhibit 8   Declaration of Gudmundur Kjaernested, June 30, 2015

## I.      QUESTION PRESENTED

Whether TransAtlantic Lines, LLC ("TransAtlantic") is entitled to a preliminary injunction when the United States Transportation Command's ("TRANSCOM") selection of Schuyler Line Navigation Company, LLC ("Schuyler") for a Contract award was arbitrary, capricious, an abuse of discretion, and conducted in violation of federal procurement law because the decision was based on an improper and flawed evaluation of Schuyler's proposal that did not conform to the Solicitation's requirements?

## II.     STATEMENT OF THE CASE

### A.      Introduction

This bid protest action arises out of TRANSCOM's decision to select Schuyler for award of the contract (the "Contract" or the "award") resulting from Solicitation HTC711-14-R-W001 (the "Solicitation" or "RFP") for regularly scheduled commercial liner service of containerized and breakbulk cargo between Jacksonville/Blount Island, Florida and U.S. Naval Station Guantanamo Bay, Cuba ("GTMO").  Jurisdiction is predicated on the Tucker Act, 28 U.S.C. § 1491(b).

TRANSCOM is responsible for the movement of Department of Defense ("DoD") personnel and cargo worldwide in support of peace, wartime, and contingency operations.  For the past 18 years, TransAtlantic has supported TRANSCOM on a variety of government contracts, including a predecessor contract to the one at issue here.  Since April 2013, TransAtlantic has provided sealift transportation services for GTMO through Government Bills of Lading issued by TRANSCOM.  Most recently, TransAtlantic has provided these services under One-Time-Offers ("OTOs") issued by TRANSCOM under the multiple award indefinite-delivery/indefinite-quantity Universal Services Contract ("USC-7").  Currently, TransAtlantic is

operating under these awarded OTOs to provide TRANSCOM with its required ocean vessel transportation services to GTMO through July 2015.

The Agency issued Solicitation HTC711-14-R-W001 in September 2014 for dedicated liner services between Jacksonville, Florida and GTMO, contemplating award of a fixed-price requirements contract for a base and two option years. TransAtlantic timely submitted a fully compliant proposal in response to the Solicitation. TransAtlantic was notified on March 9, 2015 that TRANSCOM had selected Schuyler for Contract award.

After receiving an Agency debriefing, TransAtlantic filed a protest at the Government Accountability Office ("GAO"). Documents contained in the Agency Report ("AR") produced by TRANSCOM during the GAO protest revealed that Schuyler's proposal did not comply with the Solicitation's technical requirements regarding liner service scheduling. Moreover, the AR confirmed that TRANSCOM had improperly evaluated Schuyler's technical proposal by rating it as ▮▮▮▮▮▮▮ when in fact, based upon the Solicitation's stated evaluation criteria, Schuyler's non-compliant proposal should have received an "Unacceptable" rating, thereby precluding it from award. Based on these additional findings, TransAtlantic filed a supplemental GAO protest.

One of the most glaring errors TRANSCOM made during its evaluation of Schuyler's proposal was its decision to ignore the Solicitation's requirement that offerors submit a proposed liner schedule providing for departures from both Jacksonville and GTMO on a "fixed-day–of–the–week," occurring at least every 14 days. Whereas TransAtlantic had complied fully with the Solicitation's schedule requirements by proposing a firm schedule that specifically identified ▮▮▮▮▮▮ as the fixed day of the week its vessel would depart GTMO, every 14 days, over the course of the Contract's three-year period of performance, Schuyler did not. Instead, Schuyler

proposed █████████████████████████████████████████████████
████████████████████████████████████ – in violation of the RFP
requirement that sailings from GTMO occur on a "fixed-day-of-the-week" throughout Contract
performance.

Schuyler proposed to perform the Contract ██████████████████████████████
████████████████ Whereas, according to Schuyler's proposal, Schuyler's ██████████
████████████████████ is scheduled to depart from GTMO every other ████████████
████████, Schuyler also proposed ████████████████████████████████████ will
depart from GTMO every other ████████████████████████████████████████████
█████████████████████████████████████████████ for departures from
GTMO to occur on a "fixed-day-of-the-week" throughout contract performance.  Moreover, it
should have been facially evident to the evaluators that Schuyler could not make the transition
████████████████████████████████████████████████████████████████████████
████████████████████████████ and maintain the requirement to depart
from GTMO at a minimum of every 14 days.

The Agency's determination that Schuyler's ██████████ non-compliant liner schedules
warranted an ██████████████ rating can only be viewed as arbitrary and capricious; not only is it
inconsistent with the Solicitation's stated evaluation procedure, but it is also wholly inconsistent
with the very *nature* of a liner service contract, which consists of "[r]epeated sailings at regular
intervals . . . maintained between the same designated ports;" it is the "constant reassurance of
this scheduling [that] constitutes the essence of liner service."[1]

TRANSCOM's failure to evaluate Schuyler's technical proposal in strict accordance with
the factors specified in the Solicitation constitutes a grave procurement error that not only

---

[1] Kendall at 7 (Ex. 1).

prejudices TransAtlantic and subjects it to irreparable harm, but also one that violates federal procurement law. *See* 10 U.S.C. § 2305(b)(1). This Court, therefore, should set aside TRANSCOM's award decision as "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). *See also* 28 U.S.C. § 1491(b)(4).

### B.   Statement of Facts

#### 1.   Solicitation Overview

On September 10, 2014, TRANSCOM issued Solicitation HTC711-14-R-W001 for regularly scheduled commercial liner service of containerized and breakbulk cargo between Jacksonville/Blount Island, Florida and GTMO. *See* Ex. 2, Solicitation HTC711-14-R-W001 at 11. The Solicitation was for a small business set-aside, firm-fixed price, requirements contract with economic price adjustment for regularly scheduled commercial liner service of containerized and breakbulk cargo between Jacksonville/Blount Island, Florida and GTMO. *See id.* at 35. By definition, a liner service is a regular route on a fixed schedule. *See* Ex. 1, Kendall, Lane C., *The Business of Shipping* (1973) at 7. It consists of repeated sailings at regular intervals that are maintained between the same designated ports. *Id.*

The Solicitation indicated that TRANSCOM would conduct the procurement as a competitive, best value, lowest price technically acceptable source selection. *See* Ex. 2, Solicitation HTC711-14-R-W001, at 11. The RFP required offerors to meet all of the Solicitation's requirements, including the technical requirements contained in the Solicitation's Performance Work Statement ("PWS"). *See id.* at 7. The Solicitation also required offerors to address in their proposals how they intended to meet the Solicitation's requirements, providing sufficient detail to allow TRANSCOM to perform an effective evaluation and substantiate the validity of the offeror's stated claims. *See id.*

#### 2.   The Solicitation's Evaluation Factors and Evaluation Process

The Solicitation set forth five factors that TRANSCOM would use to evaluate the offers received in response to the RFP: (1) Voluntary Intermodal Sealift Agreement ("VISA") Participation[2]; (2) price; (3) technical capability; (4) past performance; and (5) information assurance and cyber security. Price was more important than technical capability, past performance, and information assurance and cyber security combined. *See* Ex. 2, Solicitation HTC711-14-R-W001 at 11. According to the RFP, the Agency would award the Contract to the responsible offeror *whose proposal conformed to the Solicitation* and would be most advantageous to the Government based on the offeror's price, as well as the other evaluation factors. *See id.* The Solicitation also indicated that TRANSCOM would base its evaluation solely on the information presented in the offeror's proposal. *See id.* at 7.

Under the evaluation process set forth in the Solicitation, the Agency would first determine whether an offeror met the VISA Participation factor. *See id.* If this initial requirement was met, TRANSCOM would then determine whether the offeror's proposal was "Acceptable" or "Unacceptable" as to technical capability, past performance, and information assurance and cyber security. *See id.* Only those proposals that met the VISA Participation factor and were found to be "Acceptable" in terms of technical capability, past performance, and information assurance and cyber security would be evaluated on price. *See id.*

The price evaluation would first rank the acceptable offers by their Total Proposed Price ("TPP"). Next, the acceptable proposal with the lowest TPP would be evaluated to determine whether the price was fair and reasonable. *See id.* The acceptable proposal with the lowest fair

---

[2] The Solicitation defined "VISA Participant" as "an entity that is a U.S.-flag vessel operator organized under the laws of a State of the United States, or the District of Columbia, that is a signatory party to VISA, including all United States subsidiaries and affiliates of the entity which own, operate, charter or lease ships and intermodal equipment in the regular course of their business and in which the entity holds a controlling interest." Solicitation HTC711-14-R-W001 at 12 (Ex. 2).

and reasonable TPP would then be found to represent the best value to the government and would be awarded the Contract. *See id.*

### 3.    Technical Capability Evaluation Under the Solicitation

Offerors were required to submit a technical proposal to explain how the offeror would meet all of the technical capability requirements set forth in the Solicitation. *See id.* at 10. According to the Solicitation, TRANSCOM's evaluation would determine the degree to which the offeror's technical proposal demonstrated the offeror's ability to provide the equipment and resources needed to accomplish successfully the objectives of the PWS, as well as manage, supervise, and perform the required services in accordance with the PWS. *See id.* at 13.

The Solicitation's technical capability evaluation factor consisted of three sub-factors: (a) Equipment; (b) Management of Operations; and (c) Schedule. *See id.* at 12. Under the terms of the Solicitation, offerors' technical proposals would be evaluated at the sub-factor level, meaning each of the three sub-factors would be assigned an adjectival rating of either "Acceptable" or "Unacceptable." *See id.* The ratings received for each of these sub-factors would determine an offeror's overall rating for the Solicitation's technical capability evaluation factor. *See id.*

In order for a proposal to receive an overall technical capability rating of "Acceptable," all three of the sub-factors had to be rated "Acceptable." *See id.* If any technical sub-factor received an "Unacceptable" rating, the proposal's overall technical rating would be "Unacceptable." *See id.* The Solicitation defined an "Acceptable" proposal as one that clearly meets the minimum requirements of the Solicitation. *See id.* An "Unacceptable" proposal was defined as one that does not clearly meet the minimum requirements of the Solicitation. *See id.*

To comply with the Schedule sub-factor under the overall technical capability evaluation factor, offerors were required to submit a proposed liner schedule that would meet the departure

and transit requirements as specified in the PWS. *See id.* at 10. The Solicitation specified that the proposed liner schedule needed to begin the week of February 1, 2015, which is when the Contract's period of performance was scheduled to commence. *See id.*

Most notably, the PWS required that both southbound liner service from Jacksonville to GTMO as well as northbound liner service from GTMO to Jacksonville be maintained every 14 days, at a minimum, with sailings from both ports taking place on a "fixed-day-of-the-week." *See* Ex. 3, Performance Work Statement at 4-5, Sections 3.B.4.1.1; 3.B.4.2.1. It is these critical Solicitation requirements that are central to the present action.

### 4.    Schuyler's Non-Compliant Technical Proposal

Schuyler proposed using ▮▮▮▮▮▮▮▮▮▮ operating under ▮▮▮▮▮▮▮▮▮▮▮▮ to meet the Contract's requirements. The ▮▮▮▮▮▮▮ Schuyler proposed was the ▮▮▮▮▮▮, a self-supporting cargo and container carrier. Schuyler's ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 4, Schuyler's Proposal (Oct. 15, 2014) at 82, 85-87, 93, 103, 107-09. Schuyler's proposal clearly indicated its intent to utilize ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.* at 108.

While the Solicitation may have contemplated that offerors might propose multiple vessels to perform the Contract, the Solicitation required offerors to submit a schedule that provided for sailings on a "fixed-day-of-the-week basis," within the specified transit times, irrespective of the number of vessels proposed. *See* Ex. 2, Solicitation HTC711-14-R-W001 at 10. Contrary to the Solicitation's requirement that offerors submit a proposed liner schedule establishing a "fixed-day" for sailings and meet the Contract's departure and transit requirements, Schuyler instead submitted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for sailings from GTMO. *See* Ex. 4, Schuyler's

Proposal (Oct. 15, 2014) at 108-09.  The proposed liner schedules submitted in Schuyler's proposal do not meet the Solicitation's requirement that northbound sailings take place on a fixed-day-of-the-week, nor can they meet the Solicitation's requirement that northbound sailings depart from GTMO at a minimum of every 14 days.

Specifically, Schuyler's narrative stated the ████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████ *See id.*  This facial ambiguity alone demonstrates the arbitrary and capricious nature of the Agency's acceptance of Schuyler's technical proposal. Aside from this discrepancy, Schuyler proposed ████████████████████████████ ████████████████ that reflected departures from GTMO on ███████ *See id.* at 107-09. By proposing multiple schedules that identified ████ different days of the week upon which northbound sailings from GTMO to Jacksonville could possibly commence, Schuyler's proposal failed to meet the Solicitation's stated schedule requirement which required offerors to submit a northbound liner schedule with sailings taking place on a "fixed-day-of-the-week[.]"

In other words, offerors could have proposed multiple vessels so long as each vessel departed Jacksonville and GTMO on the same "fixed-day-of-the-week," however proposing different vessels that have different departure days from Jacksonville or GTMO violates the express terms of the RFP. ██████████████████████████████.  Thus, when the ████ ████████████████ Schuyler's proposal indicates the vessel may depart from GTMO on a ████████ or a ████████ On the other hand, ████████████████████████████ will depart GTMO on ████████████████████████████████████████ ████ – contradict the RFP's requirement that sailings from GTMO occur on a "fixed day-of-the–week" throughout the Contract's period of performance.



Furthermore, Schuyler's proposed ████████████ for performing the Contract would, by necessity, violate the Solicitation's requirement that sailings depart from GTMO at a minimum of every 14 days throughout contract performance.  The Schuyler proposal represented that the ████████ ██████████ for this requirement, and the ████████████ ████████████████████████████████ *See id.* at 108.  When the ████████ is operational, Schuyler's proposal indicates the vessel may depart from GTMO every other ██████ or ████████  On the other hand, when the ████████ are operational, the vessel will depart GTMO every other ████████.  Accordingly, every time Schuyler transitions from the ████████████████████████████████████, departures from GTMO will change from every other ████████ or ████████ to every other ████████ thereby extending the frequency of departures from GTMO one to two days beyond the Solicitation's 14-day departure requirement.  Instead of departure from GTMO at a minimum of every 14 days, the transition from the █████████████████████████████████ necessarily requires a 15- or 16-day period between GTMO departures, contrary to the RFP requirement.

Schuyler's proposed multiple schedules, with multiple departure days from GTMO, contradict the RFP's requirement that sailings from GTMO occur on a "fixed-day-of-the-week" at a minimum of every 14 days throughout the Contract's period of performance.

### 5.    TRANSCOM's Flawed Evaluation Process

Consistent with the terms of the Solicitation, TRANSCOM determined that TransAtlantic's proposal met the VISA Participation requirement, and properly rated TransAtlantic's proposal ████████ as to technical capability, past performance, and information assurance and cyber security. By contrast, TRANSCOM's evaluation of Schuyler's proposal was severely flawed.   While Schuyler's proposal met the VISA Participation requirement, it did not, on its face, meet the Solicitation's technical capability requirements

under the Schedule sub-factor. Despite the facial deficiencies of Schuyler's technical proposal related to the Solicitation's Schedule sub-factor, TRANSCOM erroneously rated Schuyler's technical proposal as ████████ in direct contravention of the Solicitation's stated evaluation process.

Given Schuyler's failure to comply with the Solicitation's schedule requirements, its proposal should have received a technically "Unacceptable" rating under the express terms of the Solicitation, and therefore should not have been given any further consideration for Contract Award. Nevertheless, TRANSCOM improperly proceeded to evaluate Schuyler's non-compliant proposal under the Solicitation's price factor. Because Schuyler's final total price proposal was lower than TransAtlantic's, the Agency improperly selected Schuyler for Contract Award.

### 6.    TransAtlantic's GAO Bid Protest

After being notified that TRANSCOM had selected Schuyler for contract award on March 9, 2015, and after receiving a written debriefing on March 13, 2015, TransAtlantic timely filed initial and supplemental protests with GAO on March 16, 2015 and April 27, 2015, respectively. *See* GAO Protest No. B-411242, Mar. 16, 2015 (Ex. 6) and GAO Protest No. B-411242.2, Apr. 27, 2015 (Ex. 7).   As a result of TransAtlantic's protest, the Contract award was stayed pursuant to the Competition in Contracting Act. 31 U.S.C. § 3553(c)(1); 48 C.F.R. § 33.104(c).

TransAtlantic argued, *inter alia*, that TRANSCOM's evaluation of Schuyler's proposed liner schedules was flawed and improper. TransAtlantic asserted that the numerous deficiencies in Schuyler's technical proposal should have been apparent to TRANSCOM upon evaluation, thereby rendering Schuyler's proposal technically unacceptable, yet the Agency still selected Schuyler for contract award despite its non-compliant proposal. On June 23, 2015, GAO issued

a decision denying TransAtlantic's bid protest.  *See* GAO Decision, B-411242; B-411242.2 (June 23, 2015), Ex. 7.

Glossing over critical, determinative facts, GAO denied TransAtlantic's bid protest. GAO erroneously concluded that ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████  GAO concluded Schuyler's ███████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████  *See id.* at 9. TransAtlantic maintains that GAO was incorrect.  The essence of liner service is the "constant reassurance" of the schedule. Kendall, Lane C., *The Business of Shipping* (1973) at 7 (Ex. 1).[USE SHORT FORM] Schuyler's proposal failed ██████████████████████  sailings from GTMO would occur on a firm "fixed-day-of-the-week" schedule, or at a minimum of every 14 days, as expressly required by the RFP.  TRANSCOM's decision to select Schuyler for Contract award was contrary to the Solicitation's schedule requirements, and GAO's decision to deny TransAtlantic's protest on this basis was in error..

## 7.   Prejudice and Irreparable Harm Due To TRANSCOM's Actions

TransAtlantic will suffer serious prejudice and irreparable harm if it is not awarded the Contract due to TRANSCOM's erroneous selection of Schuyler for award.   In terms of prejudice, had TRANSCOM properly rejected Schuyler's non-compliant technical proposal, TransAtlantic would have inevitably received the Contract award since TransAtlantic was the only other offeror, and its proposal was properly found to be technically acceptable and its price fair and reasonable. As it relates to irreparable harm, ██████████████████████████ ████████████████████████████████████████████.  *See* Decl. of Gudmundur

Kjaernested ("Kjaernested Decl.") ¶ 6, June 30, 2015 (Ex. 8). 

. *Id.* ¶ 8.

*Id.* ¶ 7.

*Id.*

*Id.* ¶ 10.

*Id.* ¶ 9.

*Id.* ¶ 11.

The public also stands to lose by virtue of TRANSCOM's improper handling of the subject procurement. Because TRANSCOM did not conduct an honest and fair evaluation of Schuyler's proposal, the integrity of the procurement process has been undermined to TransAtlantic's and the public's detriment.

### III.   ARGUMENT

TransAtlantic seeks a preliminary injunction that would prevent TRANSCOM from proceeding with any performance of the work by Schuyler associated with the Contract. This Court has jurisdiction under the Tucker Act to issue an injunction restraining TRANSCOM from

commencing performance of the Contract.  28 U.S.C. § 1491(b)(1).  That section authorizes this Court "to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed contract."  *Id.*  The Court may award any relief that it considers proper, including declaratory and injunctive relief.  *Id.* § 1491(b)(2).

TransAtlantic has standing to bring this action and is an "interested party" because it is a government contractor that is an "actual . . . offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *AFGE, Local 1482 v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2004).

## A.     TransAtlantic is Entitled to a Preliminary Injunction

TransAtlantic is entitled to an injunction preventing TRANSCOM from proceeding with the performance of the Contract.  The decision to grant injunctive relief falls within the sound discretion of the trial court.  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *Lab. Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 654 (2014).  A preliminary injunction is designed "merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

In order to obtain a preliminary injunction, the moving party must demonstrate that: (1) it has a likelihood of success on the merits; (2) it will suffer irreparable harm if preliminary relief is not granted; (3) the harm it will suffer outweighs the harm to the government and to third parties; and (4) the grant of relief is not contrary to the public interest.  *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 154-55 (2010).  "No one factor, taken individually, is necessarily dispositive . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others."  *FMC Corp.*, 3 F.3d at 427.  Moreover, "equitable factors are of particular significance

at the preliminary stage, where the question is whether to change the position of the parties during the litigation." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1364 (Fed. Cir. 2008).

Application of these factors demonstrates that TransAtlantic is entitled to a preliminary injunction.

### 1. TransAtlantic Will Likely Succeed on the Merits Because TRANSCOM's Evaluation of Schuyler's Proposal Ignored Express Requirements of the Solicitation

To demonstrate a likelihood of success on the merits, the plaintiff must show that the agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 28 U.S.C. § 1491(b)(4) (adopting standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)).

In applying the APA standard to protests, the Court determines whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009); *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). The Court's review is based upon the administrative record of the procurement. RCFC 52.1(a); *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005). If the agency's action "evinc[es] rational reasoning and consideration of relevant factors," the court will sustain the action. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

Conversely, when the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,'" its decision will be set aside. *Alabama Aircraft Indus. Inc. v. United States*,

586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]lthough the arbitrary and capricious standard is highly deferential, 'it is not a rubber stamp.'" *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 358 (2004) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).

An agency's award of a contract to an offeror who fails to submit a proposal that complies with the language of the solicitation must be set-aside. *See Mangi Envtl. Grp., Inc. v. United States*, 47 Fed. Cl. 10, 17 (2000) ("where a proposal is not compliant with the mandatory technical requirements of the solicitation, the proposal is unacceptable for award.") (holding procuring agency violated federal procurement law by improperly crediting awardee's proposal with meeting technical requirements of solicitation when it should have been judged technically unacceptable, and that protestor was prejudiced as the only offeror that submitted a technically acceptable proposal and was entitled to injunctive relief). *See also Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365 (Fed. Cir. 1999) (reversing and remanding trial court's decision and holding that agency's error in awarding contract to bidder whose proposal was technically non-compliant due to its failure to comply with a particular solicitation requirement was prejudicial to unsuccessful bidder).

a.      **TRANSCOM failed to adhere to the terms of the Solicitation when evaluating Schuyler's proposal**

The Solicitation set forth the factors as well as the process TRANSCOM was supposed to use to evaluate each offerors' proposals. The process for evaluation and award was established as follows:

> After receipt of proposals … responsive offerors … will be evaluated for technical capability, past performance, and information assurance & cyber security. Of the … offerors that are deemed acceptable, the Government will rank the offeror's Total

> Proposed Price … in ascending total price order and the lowest Total Price Proposed price proposal will be evaluated to determine whether the price is fair and reasonable. If the price is determined fair and reasonable, that offeror represents the best value to the government and the evaluation process concludes. Upon determination of offeror responsibility, award will be made to that VISA Participant without further consideration of any other offers.
> …

*See* Ex. 2, Solicitation at 11. Thus, under the terms of the Solicitation, only those proposals that received "Acceptable" ratings for each of the technical capability sub-factors could potentially be eligible for additional award consideration under the price evaluation factor.

The schedule requirements found in Section 3.B.4.2.1 of the PWS, requiring offerors to submit a proposed liner schedule that will provide northbound departures from GTMO to Jacksonville on a "fixed-day-of-the week basis," at a minimum of every 14 days, was a material requirement of the Solicitation. Section 3.B.4.2.1 of the RFP states in relevant part:

> The Contractor shall maintain a scheduled service northbound GTMO to Jacksonville/Blount Island. Frequency of such service must be, at a minimum, every 14 calendar days. Sailings shall be on a fixed-day-of-the-week basis, on a fixed day selected by Contractor.

*Id.* at 54. In an attempt to meet this requirement, Schuyler proposed ███████████ ████████████████████████████████████████████████████████ *Ex.* 4 at 107-110. Schuyler's proposal narrative regarding the schedule requirement begins:



*Ex.* 4 at 107-108. The Schuyler proposal goes on to state that offering ████████████

████████████████████████████████████████ *Ex.* 4 at 108. However, Schuyler's

proposal unquestionably established that Schuyler failed to meet the requirement to depart

GTMO at a minimum of every 14 days on a "fixed-day-of-the-week" in three fundamental ways.

First, Schuyler's proposal included a ████████████████████████████ in its

proposal indicating the ███████ will depart from GTMO every other ██████ not every

other ████████ as stated in its narrative:



*Id.* at 108. At the very least, this facial discrepancy between the narrative and the chart required

clarification prior to any finding of technical acceptability.   Read in its entirety, it unclear

whether Schuyler, when using ████████████, intends to depart GTMO on ███████ or on

██████████   To the extent the proposal reserves a right to depart on either day it violates the

RFP requirement that sailings be on a "fixed-day-of-the-week[.]"   Nevertheless, the evaluators

excused, waived or ignored this discrepancy and arbitrarily awarded the Contract based on a

proposal that plainly failed to commit to depart GTMO on a "fixed-day-of-the-week" as required.[3]

Second, the foregoing facial discrepancy aside, Schuyler also proposed to use an

[REDACTED] at 109.

Schuyler's proposal thus included up to [REDACTED] days for departure from GTMO [REDACTED] and, therefore, failed to propose a liner schedule on a

---

[3] This discrepancy is one of the reasons TransAtlantic submits the GAO erroneously concluded that "Schuyler did not take exception to any of the PWS's schedule requirements." *See* GAO Decision at 9 (Ex. 7).

"fixed-day-of-the–week basis" throughout contract performance, as was required by the Solicitation. Thus, Schuyler's proposal failed to meet the express terms of the Contract.[4]  *Ex. 2* at 54.

Third, Schuyler's proposed ▆▆▆▆ solution for performing the Contract necessarily violates the Solicitation's requirement that sailings depart from GTMO at a minimum of every 14 days. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Accordingly, every time Schuyler transitions from the ▆▆▆▆ schedule to ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆ departures from GTMO will change from every other ▆▆▆▆▆▆▆▆  ▆▆▆

▆▆▆▆▆▆, thereby extending the frequency of departures from GTMO one to two days beyond the Solicitation's 14-day departure requirement. Instead of departure from GTMO at a minimum of every 14 days, the transition from ▆▆▆▆▆ schedule to ▆▆▆▆▆

▆▆▆▆▆ necessarily requires a 15- or 16-day period between GTMO departures, contrary to the RFP requirement.

The ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ contradict the RFP's requirement that sailings from GTMO occur on a "fixed-day-of-the-week" at a minimum of every 14 days throughout the Contract's period of performance.[5]  Scheduling is one of the most critical aspects of a liner service contract. It is the "constant reassurance of this scheduling [that] constitutes the essence of liner service." Kendall, at 7 (Ex. 1). Liner service is analogous

---

[4] This deficiency is another reason the GAO erroneously concluded that "Schuyler did not take exception to any of the PWS's schedule requirements." *See* GAO Decision at 9 (Ex. 7).

[5] This deficiency is a third reason GAO erroneously concluded that "Schuyler did not take exception to any of the PWS's schedule requirements." *See* GAO Decision at 9 (Ex. 7).

to a bus service where riders know in advance the bus schedule and can plan accordingly with "constant reassurance" the bus will arrive according to its regular schedule. Schuyler's ████ ████████ with different proposed days of the week for GTMO departure are in *direct* contravention of the Solicitation's terms requiring liner service.

The scenario created by Schuyler's proposal is akin to a bus line that utilizes two different busses that run on two different schedules, depending on which of the buses is operational. Yet, the bus company does not provide bus riders with any information as to which bus will be running at any given time, thus rendering the two different schedules essentially useless for planning. According to Schuyler's proposal, ████████████████████ ████████████████████████████████████████████ ████████████████████████████████ This is a flagrant violation of the RFP requirement. Given the blatant disregard for the Solicitation's stated requirements in this regard, this flaw in TRANSCOM's evaluation process was an abuse of discretion that should not be overlooked or disregarded.

### b.   TRANSCOM's Evaluation of Schuyler's Proposal Was Contrary to Law

TransAtlantic is also likely to be successful on the merits because TRANSCOM'S evaluation of Schuyler's proposal and subsequent award decision were both contrary to federal procurement law. When evaluating competitive proposals, an agency shall assess their relative qualities solely on the factors and sub-factors specified in the solicitation. *See* 10 U.S.C. § 2305(b)(1); 48 C.F.R. § 15.305(a); *see also CSE Constr. Co. v. United States*, 58 Fed. Cl. 230, 245 (2003) ("Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations[.]").

20

Under § 2305(b)(1), TRANSCOM was required to evaluate Schuyler's proposal based solely on the factors specified in the Solicitation, and the Agency's award decision was also required to follow the Solicitation's terms. Here, instead of rejecting Schuyler's ███████ ████████████████ reflecting GTMO departures on varying days of the week, TRANSCOM instead made unallowable exceptions and allowances – all in Schuyler's favor – that were inconsistent with the plain language of the Solicitation. Quite simply, Schuyler's proposal did not comply with the Solicitation's schedule requirements and therefore should not have even been *considered* for award. To that end, TRANSCOM's failure to adhere strictly to the Solicitation's terms when evaluating Schuyler's proposed liner schedules was not in accordance with the law. This is yet another reason why TransAtlantic is likely to be successful on the merits in this case.

### c. TransAtlantic Suffered Prejudice By TRANSCOM's Arbitrary and Capricious Evaluation of Schuyler's Proposal

"To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions." *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 80 (2013). To establish prejudice, "the protester must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Id.*

As TransAtlantic was the only other offeror in this procurement, had TRANSCOM followed by the Solicitation's evaluation criteria and rejected Schuyler's non-compliant technical proposal, TransAtlantic would have inevitably received the Contract award because its proposal was fully compliant and properly rated as technically ███████ Indeed, TransAtlantic had more than just a "substantial chance" for award; as the only other offeror, it had the *only* chance for award, notwithstanding TRANSCOM's flawed evaluation of Schuyler's proposal.

TRANSCOM's arbitrary and capricious evaluation of Schuyler's technical capability was a prejudicial error, which led to an improper price evaluation that ultimately resulted in TransAtlantic being denied the award to which it was entitled.   Because TransAtlantic was severely prejudiced by TRANSCOM's flawed evaluation process and erroneous award decision, success on the merits is likely in this case.

### 2.    TransAtlantic Will Suffer Irreparable Harm If It Is Denied the Contract Award

TransAtlantic is entitled to a preliminary injunction because it will suffer irreparable harm as a result of TRANSCOM's procurement error.   As an initial matter, TransAtlantic has been irreparably harmed by being denied the opportunity to compete in a fair competitive process.   "A lost opportunity to compete in a fair competitive bidding process for a contract . . . has been found sufficient to prove irreparable harm." *Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 791 (2009) (internal quotations omitted).   Here, the competitive process was unfair because TRANSCOM deviated from the evaluation process set forth in the Solicitation and relaxed the Solicitation's schedule requirements to Schuyler's benefit, resulting in irreparable harm to TransAtlantic.   *See Mangi Envtl. Grp., Inc. v. United States*, 47 Fed. Cl. 10, 19-20 (2000) ("plaintiff has demonstrated . . . irreparable harm because a proper evaluation may have led to its selection for the award.").

TransAtlantic has also suffered irreparable harm due to TRANSCOM's erroneous award decision as the company has lost a valuable business opportunity by being denied a contract that it rightfully deserved, as well as the potential profits it stood to earn performing the contract. Furthermore, the "opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm." *United Int'l Investigative Servs. v. United States*, 41 Fed. Cl. 312, 323 (1998) (*citing Magnavox Elec. Sys. Co. v. United States*, 26 Cl. Ct. 1373, 1379

(1992), *aff'd*, 194 F.3d 1335 (Fed Cir. 1999)). *See also PGBA, L.L.C. v. United States*, 57 Fed. Cl. 655, 664 (2003), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004). Indeed, this Court "has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm." *BINL, Inc. v. United States,* 106 Fed.Cl. at 49 (quoting *Furniture by Thurston v. United States,* 103 Fed.Cl. 505, 520 (2012) (citing *BayFirst Solutions, LLC v. United States,* 102 Fed.Cl. at 696)).

Here, the loss of this business opportunity ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Kjaernested Decl. ¶ 6 (Ex. 8). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



*See id.* ¶ 11.

Moreover, TransAtlantic does not have an adequate remedy at law if it is successful in this bid protest.  It is well-settled that TransAtlantic cannot recover lost profits from its bid protest action. *See Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 115, 119 (2002) (lost profits

not available on implied-in-fact contract theory; remedy for recovery in bid protest actions is typically injunctive relief). "This loss of profit, for which there is no adequate remedy at law, is accepted as a 'specific, irreparable injury' that warrants the entry of an injunction." *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 142 (1999) (citing *Wetsel-Oviatt Lumber Co. v. United States*, 43 Fed. Cl. 748, 753 (1999)).

"Denial of the opportunity to obtain the present contract and the profits derived therefrom is precisely what plaintiff refers to when alleging its 'lost opportunity to compete'. This is an irreparable injury." *Magnavox*, 26 Cl. Ct. at 1379; *see J & H Reinforcing & Structural Erectors, Inc. v. United States*, 50 Fed. Cl. 570, 577 (2001); *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000); *Seattle Sec. Servs. v. United States*, 45 Fed. Cl. 560, 571 (1999); *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl. Ct. 33, 78 (1989).

### 3.   The Harm to TransAtlantic Outweighs Any Potential Harm to TRANSCOM or Schuyler

When determining whether TransAtlantic is entitled to a preliminary injunction, the Court must also "balance the potential harm to the plaintiff of not granting the injunction against the potential harm to both the Government and the awardee should the injunction be granted." *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 654 (2003). The harm that TransAtlantic will suffer if this motion is denied outweighs the harm to TRANSCOM and Schuyler if the injunction is granted. If the motion is denied, TransAtlantic not only faces ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ *See* Kjaernested Decl. ¶¶ 6, 11 (Ex. 8).

By contrast, the Government will suffer no harm by the grant of a preliminary injunction as TransAtlantic is already under contract to perform the government's ocean transportation

services between Jacksonville and GTMO through July 2015 under OTOs awarded to TransAtlantic under its current USC-7 contract. To the extent this matter extends beyond July, TRANSCOM can simply continue to compete short term OTOs to USC-7 contract holders on a per voyage basis as needed.

With respect to Schuyler, it certainly should not be permitted to benefit from an award to which it was not entitled. Moreover, TAL recently learned that Schuyler has accepted another assignment for the ▮▮▮▮▮ to provide liner service to ▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *See* Ex. 8, Kjaernested Decl. ¶ 12. Accordingly, Schuyler's ▮▮▮▮▮▮ is not even available for contract performance until the end of August at the earliest. Indeed, it is this very diversion of ▮▮▮▮▮▮ that makes the award to Schuyler so problematic: the Schuyler proposal improperly allows Schuyler to divert its supposed ▮▮▮▮ ▮▮▮ servicing the Contract to earn income on other short term government contract opportunities throughout the term of the Contract, while substituting the EOT SPAR for a tug and barge that cannot maintain the same schedule as ▮▮▮▮▮▮ These additional competitive opportunities available to Schuyler through diversion of ▮▮▮▮▮ come at the government's expense, because with the diversion ▮▮▮▮▮▮, Schuyler cannot meet the minimum 14-day departure requirement from GTMO on a "fixed-day-of-the-week" as required by the Contract.

Accordingly, while the Court considers the merits of the protest, TRANSCOM can still obtain its sealift transportation requirements from TransAtlantic's experienced and highly qualified personnel through the month of July, and can release short term OTOs to USC-7 contract holders for any additional time that may be required for the adjudication of this bid

protest. Therefore, granting Plaintiff's motion will not in any way affect the satisfaction of the contract requirements. *See Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 772 (2008).

Accordingly, the balance of hardships strongly favors TransAtlantic's requested relief.

### 4.    Granting Injunctive Relief Is Strongly In the Public Interest

Finally, the public interest would be served by granting injunctive relief because the public has a strong interest in protecting the competitive process. *See e.g., MVM, Inc.*, 46 Fed. Cl. at 143 ("Many cases have recognized that the public interest is served when there is integrity in the public procurement system."); *Minor Metals v. United States*, 38 Fed. Cl. 16, 21 (1997) ("It is not in the public interest to allow a fundamentally flawed government solicitation to proceed when there are known defects which can be cured."); *Day & Zimmerman Servs. v. United States*, 38 Fed. Cl. 591, 610 (1997) ("we find that the public interest in protecting the integrity of the procurement system from unreasonable or irrational conduct and in ensuring that contracting agencies provide sufficient documentation to permit proper review of their actions is served by granting a permanent injunction.").

In this case, there are also several practical reasons why the public interest would be served by setting aside TRANSCOM's decision to award the Contract to Schuyler. By overlooking the obvious deficiencies in Schuyler's proposal related to liner scheduling, and nevertheless selecting Schuyler for award, TRANSCOM has potentially jeopardized the military's ability to rely upon fixed-day-of-the week departures from GTMO at least every 14 days if the Agency's award decision is not set aside. GTMO is a remote location that houses numerous military units and commands, including a Naval hospital, Joint Task Force Guantanamo, which operates the Guantanamo Bay detention camps, and an active unit of the Marine Corps Security Force Regiment, a security and anti-/counter-terrorism unit. Therefore, reliable, regularly scheduled liner transportation is essential to ensuring mission success for each

of these military organizations, as well as the many others at GTMO that protect and defend the interests of the American public.

### B.   No Bond Is Warranted

Under RCFC 65, the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." RCFC 65(c). The purpose of such a bond is "to make good any loss to any party that judicial interference may cause, if it is not ultimately upheld." *Allen M. Campbell Co. v. United States*, 467 F.2d 931, 934 (Ct. Cl. 1972) (Nichols, J., concurring).   Here, the requested preliminary injunction will simply reverse the arbitrary and capricious actions taken by TRANSCOM in wrongfully awarding the contract to Schuyler.   TRANSCOM can continue to fulfill its GTMO requirement by issuing OTOs to USC-7 contract holders.   It is highly improbable that TRANSCOM would incur any damages in conjunction with a preliminary injunction.   Therefore, TransAtlantic respectfully submits that no bond should be required.

### IV.   CONCLUSION

For the foregoing reasons, Plaintiff TransAtlantic requests that its Motion for Preliminary Injunction be granted.

Date:  July 1, 2015

Respectfully submitted,
/s/ Brian S. Gocial
Brian S. Gocial, Esq.
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Phone:  (215) 569-5424
Fax:  (215) 832-5424
Gocial@BlankRome.com

Of Counsel:

Kendra P. Norwood, Esq.
Blank Rome LLP
Watergate
600 New Hampshire Ave., NW
Washington, DC 20037
KNorwood@BlankRome.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 1st day of July 2015, a true and correct copy of Plaintiff

TransAtlantic Lines LLC's Memorandum in Support of its Motion for Preliminary Injunction

was served by first-class mail, postage prepaid, on Defendant's counsel, as follows:

Mr. Alexander Sverdlov
Commercial Litigation Branch
United States Department of Justice
Civil Division
Post Office Box 480
Washington, D.C. 20044

/s/ Brian S. Gocial
Brian S. Gocial, Esq.
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
Phone:  (215) 569-5424
Fax:  (215) 832-5424
Gocial@BlankRome.com

# EXHIBIT 1

# EXHIBIT

# REDACTED

# IN

# ITS

# ENTIRETY

# EXHIBIT 2

# EXHIBIT

# REDACTED

# IN

# ITS

# ENTIRETY

# EXHIBIT 3

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# EXHIBIT

# REDACTED

# IN

# ITS

# ENTIRETY

# EXHIBIT 5

# EXHIBIT

# REDACTED

# IN

# ITS

# ENTIRETY

# EXHIBIT 6

# EXHIBIT

# REDACTED

# IN

# ITS

# ENTIRETY

# EXHIBIT 7

# EXHIBIT
# REDACTED
# IN
# ITS
# ENTIRETY

# EXHIBIT 8

# EXHIBIT

# REDACTED

# IN

# ITS

# ENTIRETY