# In the United States Court of Federal Claims

No. 15-689C

(E-Filed:  August 10, 2015)[1]

| | |
|---|---|
| TRANSATLANTIC LINES, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Post-Award Bid Protest; Cross- |
| v. | ) Motions for Judgment on the |
| | ) Administrative Record; |
| THE UNITED STATES, | ) Technical Proposal Evaluation |
| | ) |
| Defendant. | ) |
| | ) |

Brian S. Gocial, Philadelphia, Pa., for plaintiff.

Alexander V. Sverdlov, Trial Attorney, with whom were Benjamin C. Mizer, Acting
Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Douglas K. Mickle,
Assistant Director, Commercial Litigation Branch, Civil Division, United States
Department of Justice, Washington, D.C., for defendant.

## OPINION and ORDER

CAMPBELL-SMITH, Chief Judge

This case involves a post-award bid protest filed by TransAtlantic Lines, LLC
(TransAtlantic or plaintiff).  TransAtlantic challenges the decision of the United States
Transportation Command[2] (TRANSCOM, the agency, or defendant) to award a contract

---

[1]     This Opinion was originally filed under seal on July 31, 2015.  ECF No. 29.  The
court requested the parties to file a motion by Friday, August 7, 2015, if either party
believed that the Opinion should be redacted.  Having received no requests for
redactions, the Opinion is reported in its entirety.

[2]     The United States Transportation Command "is a unified, functional combatant
command which provides support to the eight other U.S. combatant commands, the
military services, defense agencies and other government organizations."  U.S.

for commercial liner service to Schuyler Line Navigation Company, LLC (Schuyler). TransAtlantic contends that Schuyler's technical proposal failed to comply with certain material terms of the Solicitation and, therefore, Schuyler's proposal should have been excluded from consideration for award.  Because TransAtlantic was the only other offeror, and because TransAtlantic's proposal complied with the terms of the Solicitation, TransAtlantic argues that it should have been awarded the contract.

The parties submitted cross-motions for judgment on the administrative record (AR) in accordance with United States Court of Federal Claims Rule (RCFC) 52.1(c).[3] See Pl.'s Mot. J. AR (Pl.'s Mot.), July 1, 2015, ECF No. 9[4]; Def.'s Mot. J. AR (Def.'s Mot.), July 9, 2015, ECF No. 23; see also Pl.'s Resp., July 14, 2015, ECF No. 26; Def.'s Reply, July 21, 2015, ECF No. 28.  Oral argument was not deemed necessary.

For the reasons explained below, the court finds that Schuyler's technical proposal complied with the material terms of the Solicitation.  Accordingly, plaintiff's motion is **DENIED**, and defendant's motion is **GRANTED**.

I.      Background

    A.      Solicitation

On September 10, 2014, TRANSCOM issued Solicitation HTC711-14-R-W001. See Tab 15, AR 131–289 (Solicitation).[5]  The Solicitation sought "regularly scheduled commercial liner service" of containerized and breakbulk cargo between Jacksonville/Blount Island, Florida and United States Naval Station Guantanamo Bay, Cuba (GTMO).  Id. at AR 182; see id. at AR 221 (defining "[r]egularly [s]cheduled" as

---

Transportation Command, About USTRANSCOM, http://www.transcom.mil/about/whatIs.cfm (last visited July 27, 2015).

[3]     Defendant filed the administrative record (AR) under seal on July 9, 2015 in the form of a CD-ROM.  See ECF No. 24.

[4]     The court cites to plaintiff's memorandum in support of its motion for preliminary injunction, ECF No. 9, which was converted on July 6, 2015 to a motion for permanent injunction and for judgment on the administrative record, ECF No. 13.

[5]     TRANSCOM issued two amendments to the Solicitation, neither of which is relevant to this protest.  See Tab 17, AR 299–305 (Am. 1); Tab 19, 308–75 (Am. 2).

"[s]ailing at regular intervals maintained between the same port ranges and consisting of regular arrivals, regular departures along an established route").  The Solicitation was designated as a small business set-aside, id. at AR 131, and contemplated the award of a firm-fixed price requirements contract[6] for a base year and two option years, see id. at AR 133–35, 165.

The Solicitation provided that the procurement would be conducted as a best value, lowest-priced technically acceptable (LPTA) source selection.  Id. at AR 141; see FAR 15.101-2 (2014) (describing the LPTA source selection process).  Offerors were instructed "to meet all solicitation requirements, including terms and conditions, representations and certifications, and technical requirements in the [Performance Work Statement (PWS)]."  Tab 15, AR 137.  Offerors were also advised that "[t]he [g]overnment reserves the right to . . . incorporate all, part or none of the offeror's written proposal into the resultant contract."  Id.

Offerors were to be evaluated based on five factors:  (1) Voluntary Intermodal Sealift Agreement (VISA) participation, (2) price, (3) technical capability, (4) past performance, and (5) information assurance and cyber security.  Id. at AR 142.  After assigning preference to offerors that were VISA participants, the agency would assign a rating of acceptable or unacceptable to the technical capability, past performance, and information assurance and cyber security factors.  Id. at AR 141.  The agency would then evaluate the prices of those offerors deemed acceptable.  Id.  An "[a]ward [would] be made to the lowest priced responsible offeror meeting or exceeding the requirements for technical capability, past performance, information assurance and VISA participation." Id.

The Solicitation provided that the agency would evaluate the technical capability factor by examining "the degree to which the information provided by the offeror in its proposal demonstrates the offeror's ability to provide the equipment and resources needed to successfully accomplish the objectives of the [PWS], as well as manage, supervise, and perform the required services in accordance with the PWS."  Id. at AR 143.  The technical capability factor was comprised of three sub-factors, and an

---

[6]     "A requirements contract provides for filling all actual purchase requirements of designated Government activities for supplies or services during a specified contract period (from one contractor), with deliveries or performance to be scheduled by placing orders with the contractor."  FAR 16.503(a) (2014).  "[A] requirements contract necessarily obligates the Government to purchase exclusively from a single source." Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1305 (Fed. Cir. 1998).

unacceptable rating as to any of the three sub-factors would result in an overall technical rating of unacceptable.  Id.  An acceptable rating would be assigned if the "[p]roposal clearly [met] the minimum requirements of the solicitation," whereas an unacceptable rating would be assigned if the proposal did not "clearly meet the minimum requirements of the solicitation."  Id.

Offerors were instructed to "submit written narratives for evaluation of technical capability."  Id. at AR 140.  The written narratives were to "demonstrate the offeror's understanding of the requirements identified in the [PWS]," id. at AR 141, and "explain how the offeror [would] meet all requirements established in the solicitation," id. at AR 140.  Offerors were to include written narratives for each of the three technical capability sub-factors:  (1) equipment, (2) management of operations, and (3) schedule.  Id.

Under the equipment sub-factor, offerors were instructed to "identify the vessel(s) . . . to be utilized for this contract."  Id.  Under the management of operations sub-factor, offerors were instructed to provide a "[c]ompany overview and description of current operations in the region or ability to operate in the region."  Id.  Under the schedule sub-factor offerors were instructed as follows:

> [S]ubmit a proposed liner schedule that meets the departure, arrival, and transit requirements as specified in paragraph Section 3.B.4 of the PWS beginning the week of 1 February 2015.  Provide the proposed southbound and northbound delivery routes to include other vessel ports of call.  Describe how the delivery requirements in the PWS will be incorporated into [the] offeror's current liner schedule or whether offeror will establish a new/additional liner route.

Id. (emphasis added).

Section 3.B.4 of the PWS is entitled "Schedule Maintenance."  Id. at AR 184.  It includes two sub-sections that detail the schedule requirements for southbound and northbound sailings.  Id.  Only the northbound schedule requirements are at issue in this protest:

> The Contractor shall maintain a scheduled service northbound[,] GTMO to Jacksonville/Blount Island.  Frequency of such service must be, at a minimum, every 14 calendar days.  Sailings shall be on a fixed-day-of-the-week basis, on a fixed day selected by the Contractor.  Transit time from GTMO to Jacksonville/Blount Island is a maximum of 18 calendar days.

Id. (emphasis added); cf. Pl.'s Resp. 3 (characterizing two of the northbound schedule requirements—that "(1) the sailings from each port had to be scheduled on a 'fixed-day-of-the-week'; and [that] (2) the liner service had to depart from each port at least every 14 days"—as "central to the present action"); Pl.'s Mot. 8 (similar).

Section 3.B.4 of the PWS also required contractors to "provide and continually maintain vessel schedules in the Integrated Booking System (IBS) at least 45 calendar days in advance of the vessel sail date." Tab 15, AR 184. The PWS contemplated that schedule changes might occur. If the contractor anticipated a change in the vessel schedule, the contractor was instructed to notify the ordering officer and update the schedule in the IBS within seven calendar days prior to the next scheduled port call. Id. If the contractor anticipated a "slippage in scheduled sailing date/arrival date by more than one . . . calendar day," the contractor was to report the schedule change in writing. Id.

B.      Schuyler's Technical Proposal

Schuyler's technical proposal offered two different vessels to meet the Solicitation requirements, a "[p]rimary [v]essel" and an "[a]lternative [v]essel." Tab 21, AR 460, 463, 465 (Schuyler Proposal). The primary vessel was identified as the MV EOT Spar (EOT Spar), a "twin-screw, single-hold, self-sustaining [roll-on/roll-off] Cargo vessel." Id. at AR 463. The alternative vessel was identified as the barge Columbia Houston and the tug Atlantic Coast (Columbia Houston). Id. at AR 465. Schuyler's proposal explicitly stated that the Columbia Houston would be provided "as required to ensure uninterrupted service to GTMO." Id.

At issue in this protest is the section of Schuyler's technical proposal dedicated to the schedule sub-factor. Plaintiff contends that Schuyler's proposed liner schedules do not comply with the Solicitation's northbound schedule requirements. Pl.'s Mot. 7–8.

Per the Solicitation instructions, see Tab 15, AR 140, Schuyler submitted a written narrative describing how it intended to meet the requirements of the schedule sub-factor, Tab 21, AR 485–86. The written narrative for the schedule sub-factor states in relevant part:

> [Schuyler's] proposed schedule is based on the required sailing schedule and using the EOT Spar, with vessel departing Jacksonville, Florida every other Friday, arriving GTMO the following Tuesday, sailing Wednesday, calling Port Au Prince, Norfolk, and then arriving Jacksonville Thursday for the next loading (i.e., within 14 days). Commencing the first week of February

(February 6th, 2015), the schedule then would repeat itself until the contract is complete. Our proposed schedule for the contract meets the requirements of PWS 3.B.4, and provides for evenly distributed service through the contract period of performance . . . . [T]he EOT Spar will run about three days to GTMO and about 7-8 days back after calling Port Au Prince, Haiti and Norfolk, with one day at each load and discharge port, and thus completing the round trip voyages well within the required parameters with the option to call Port Au Prince, Haiti and Norfolk. The schedule includes a 10% weather factor. When the barge Columbia Houston is used, the schedule would be Jacksonville-GTMO-Jacksonville . . . .

Currently, [Schuyler] has a regular service serving Haiti, Central America - US Gulf/US East Coast. . . . Given that our person[nel], contractors and equipment are already in place, expansion of service to call at GTMO can be readily accommodated. . . . <u>Flexibility and reliability are [e]nsured for continuous operation by having two vessels able to serve the contract as required</u>.

<u>Id.</u> (emphasis added).

Also per the Solicitation instructions, <u>see</u> Tab 15, AR 140, Schuyler submitted proposed liner schedules that purported to meet the requirements of Section 3.B.4 of the PWS, Tab 21, AR 486–87. Schuyler submitted a "[s]ample" sailing schedule for both the EOT Spar and the Columbia Houston. <u>Id.</u> The relevant portions of the sample schedule for the EOT Spar are as follows:

| | |
|---|---|
| Day 1 (Thurs. PM): | Vessel arrives Load Port Jacksonville, Florida per SDDC[7] Schedule |
| Day 2 (Fri. PM): | Commence Sea Voyage from Jacksonville to GTMO |
| Day 4 (Mon. PM) [Day] 5 (Tues.): | Vessel arrives Naval Station GTMO (vessel will be GTMO basis new working hours as per solicitation) |
| Day 5 (Tues): | Vessel departs GTMO |
| Day 6 (Weds.) | Call Port Au Prince, Haiti and sail the same day - .5 days port time |
| Day 11 | Call Norfolk and sail the same day - .5 days port time |
| Day 13-14: | Vessel arrives Discharge-Load Port Jacksonville per SDDC Schedule • about 13 days (not to exceed 14) after departing Port of Jacksonville, vessel is ready / in position for next load out |

---

[7]     SDDC stands for Military Surface Deployment and Distribution Command, which is a component of TRANSCOM and "provides for liner service of containerized and breakbulk cargo between Jacksonville/Blount Island, Florida and U.S. Naval Station Guantanamo Bay, Cuba (GTMO)." Tab 15, AR 182 (Solicitation).

Id. at AR 486–87 (footnote added).  The relevant portions of the sample schedule for the
Columbia Houston are as follows:

| Day 1: | Vessel arrives Load Port Jacksonville, Florida per SDDC Schedule |
| Day 2 (Fri. PM): | Commence Sea Voyage from Jacksonville to GTMO |
| Day 7 (Weds.): | Vessel arrives Naval Station GTMO (vessel will GTMO basis new working hours as per [solicitation]). |
| Day 8 (Thurs.): | Vessel departs GTMO |
| Day 13: | Vessel arrives Discharge - Load Port Jacksonville per SDDC Schedule<br>• about 13 days (not to exceed 14) after departing Port of Jacksonville, vessel is ready / in position for next load out |

Id. at AR 487.  Both sample schedules were identified as "weather permitting."  Id.  In
addition to the sample schedules, Schuyler included maps that chart the roundtrip
voyages for both the EOT Spar and Columbia Houston.  Id. at AR 488.

      C.       Evaluation of the Offerors' Technical Proposals and the Source Selection
              Decision

Two offerors, TransAtlantic and Schuyler, timely submitted proposals.  Tab 76,
AR 1276 (Source Selection Decision Document).  A Source Selection Evaluation Board
(SSEB) Technical Evaluation Team was responsible for evaluating the offerors' technical
proposals.  Tab 39, AR 658 (Tech. Eval. Narrative).  The Technical Evaluation Team was
comprised of four members (including the Team's Chairperson, Randy Ellis),
representing both the United States Navy and the Military Surface Deployment and
Distribution Command (SDDC).  Id.  The Technical Evaluation Team rated both
Schuyler's and TransAtlantic's technical proposals as acceptable.  Id. at AR 659.

After determining that both proposals were acceptable on each of the non-price
factors, the SSEB conducted a price analysis of the offerors' total proposed prices.  Tab
76, AR 1276.  The contracting officer held discussions with both offerors based on
unreasonable price proposal determinations, and both submitted final price revisions.  Id.
at AR 1276–77.  Schuyler ultimately proposed a price that was $4,028,467.00 less than
TransAtlantic's proposed price, and the SSEB determined that Schuyler's proposal
represented the best value to the government.  Id. at AR 1277.

The Source Selection Authority (SSA) "reviewed the evaluation results of the
SSEB and verified that the SSEB's evaluation process followed the . . . solicitation
evaluation criteria and that the ratings were appropriately and consistently applied."  Id.
at AR 1276.  After a "thorough[] review[] [of] the SSEB analysis and award

recommendation," as well as a "review[] [of] the solicitation and the documentation supporting the SSEB report," id., the SSA concurred with the SSEB's evaluation and best value determination, id. at AR 1276–77.  The SSA concluded that Schuyler was "the low-priced offeror, [was] a VISA participant, has an Acceptable Technical Capability rating, an Acceptable Past Performance rating, and an Acceptable Information Assurance & Cyber Security rating and [its] proposal represents the best value to the Government."  Id. at AR 1277.  Accordingly, the SSA ordered the award of the contract to Schuyler.  Id.; see also Tab 78, AR 1285 (Award dated March 9, 2015); cf. Tab 15, AR 141 ("Award will be made to the lowest priced responsible offeror meeting or exceeding the requirements for technical capability, past performance, information assurance, and VISA participation.").

D.     Procedural History

On March 16, 2015, after learning that it had not been awarded the contract, TransAtlantic filed a protest at the Government Accountability Office (GAO).  Tab 84, AR 1520–37 (GAO Protest).  TransAtlantic raised several challenges to the agency's award decision, including a challenge similar to the one currently before the court—specifically, that Schuyler's technical proposal failed to comply with the Solicitation's schedule requirements and therefore, it should have been rated as unacceptable.  See generally id.; see also Tab 87, AR 1791–96 (TransAtlantic's Comments on Agency Rpt.) (arguing that "Schuyler's multiple liner schedules" did not meet the Solicitation's schedule requirements).  The GAO was unpersuaded by TransAtlantic's "objection to Schulyer's use of two slightly different schedules for its two vessels":

> [I]n light of the fact that multiple vessels could be utilized during performance, and consistent with the PWS provision that the contractor maintain "vessel schedules" in the integrated booking system, we find TRANSCOM's consideration of Schuyler's two, slightly-different schedules—both of which comply with the PWS—to be completely reasonable.  That TransAtlantic argues for a more restrictive interpretation of the PWS schedule requirement does not demonstrate that the agency's evaluation was flawed.

Tab 91, AR 1930 (TransAtlantic Lines, LLC, B-411242, B-411242.2 (Comp. Gen. June 23, 2015)).  The GAO rejected each of TransAtlantic's remaining arguments in turn, and denied TransAtlantic's protest.  See id. at AR 1924–37.

TransAtlantic filed its protest in this court on July 1, 2015.  Compl., ECF No. 1. TransAtlantic argues that the agency's decision to rate Schuyler's technical proposal as acceptable "lacked a rational basis and was arbitrary, capricious, and an abuse of

discretion." Pl.'s Resp. 2.  In plaintiff's view, "[a]n ordinary reading of the Solicitation's plain language and Schuyler's proposal confirms that Schuyler did not offer what the Solicitation required, and its proposal, therefore was unacceptable for Contract Award." Id.; see id. at 5 ("Schuyler's proposal failed to meet the material schedule terms of the Solicitation, and TRANSCOM ignored this in its evaluation.").  But for this alleged error, TransAtlantic argues that it "would have inevitably received the Contract award because its proposal was fully compliant and properly rated as technically 'Acceptable.'"  Pl.'s Mot. 21.

## II.    Legal Standards

The Tucker Act grants this court jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract."  28 U.S.C. § 1491(b)(1) (2012).

The court reviews an agency's procurement decision to determine whether the decision is supported by the administrative record.  See RCFC 52.1.  The applicable standard of review for the court's examination of an agency's decision is set forth in the Administrative Procedure Act (APA).  See 28 U.S.C. § 1491(b)(4).  In accordance with this standard, the court will set aside a decision by the agency only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2012).  A procurement decision may be set aside only if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation, or procedure.  Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Application of the arbitrary and capricious standard is "highly deferential." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000). The court is particularly deferential to the agency's technical evaluation.  L-3 Commc'ns EOTech, Inc. v. United States, 87 Fed. Cl. 656, 664 (2009); see E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (stating that "such matters as technical ratings" involve "the minutiae of the procurement process . . . that a court will not second guess"); Omega World Travel, Inc. v. United States, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals.").

To survive a challenge based on arbitrariness and capriciousness, an agency's decision need only have been "the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'"  JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 654 n.8 (2002) (quoting Baltimore Gas & Elec. Co. v.

Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)), aff'd, 56 F. App'x 474 (Fed. Cir. 2003); see Pitney Bowes Gov't Solutions, Inc. v. United States, 94 Fed. Cl. 1, 11 (2010) ("Mindful of its role on review, the court will not evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation."). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). The court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co. (Motor Vehicle), 463 U.S. 29, 43 (1983).

When interpreting a government solicitation, the court must apply the governing principles of contract interpretation. Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004). Thus, the court must begin with the plain language of the solicitation. Id. "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning . . . ." Id. The court must also interpret the solicitation as a whole, "in a manner that harmonizes and gives reasonable meaning to all of its provisions." Id.; see also NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").

III.   Discussion

Both parties agree that this is a simple case. Def.'s Mot. 1; Pl.'s Resp. 1. The sole issue in dispute is whether the agency reasonably determined that Schuyler's technical proposal complied with the Solicitation's schedule requirements.[8] See Pl.'s Resp. 1. For the following reasons, the court concludes that Schuyler's technical proposal met the minimum requirements of the Solicitation. Plaintiff has therefore failed to establish that the agency acted arbitrarily and capriciously in assigning Schuyler's technical proposal

---

[8]     Both parties also agree that if the court finds in favor of plaintiff on the merits, that an injunction would be an appropriate remedy. Def.'s Mot. 10 n.2; Pl.'s Resp. 2 n.1.

an acceptable rating.[9] <u>Cf.</u> Tab 15, AR 143 (stating that acceptable rating would be assigned if the "[p]roposal clearly [met] the minimum requirements of the solicitation").

As plaintiff correctly suggests, Pl.'s Mot. 20–21, applicable federal procurement law requires that agencies evaluate proposals and make awards "based solely on the factors specified in the Solicitation," 10 U.S.C. § 2305(b)(1) (2012); <u>see</u> FAR 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."); <u>Banknote Corp. of Am., Inc. v. United States</u>, 56 Fed. Cl. 377, 386 (2003), <u>aff'd</u>, 365 F.3d 1345 (Fed. Cir. 2004) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the Solicitation."). "[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." <u>E.W. Bliss Co.</u>, 77 F.3d at 448; <u>see</u> <u>Centech Grp., Inc. v. United States</u>, 554 F.3d 1029, 1038 (Fed. Cir. 2009) ("[A] proposal that, on its face, leads 'an agency to the conclusion that an offeror could not and would not comply with [a material term of solicitation] is technically unacceptable and may not form the basis for an award.'" (quoting <u>Chapman Law Firm v. United States</u>, 63 Fed. Cl. 519, 527 (2005), <u>aff'd</u>, 163 F. App'x 889 (Fed. Cir. 2006))). However, "[w]here a defect in a [proposal] is trivial or a mere formality, not material, the [proposal] is not required to be rejected out of hand." <u>E.W. Bliss</u>, 77 F.3d at 449 (first alteration in original) (quoting <u>M.W. Kellogg Co./Siciliana Appalti Costruzioni v. United States</u>, 10 Cl. Ct. 17, 26 (1986)).

"A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the [proposal]." <u>Blackwater Lodge & Training Ctr., Inc. v. United States</u> (<u>Blackwater</u>), 86 Fed. Cl. 488, 505 (2009); <u>see</u> <u>Grumman Data Sys. Corp. v. Dalton</u>, 88 F.3d 990, 1000 (Fed. Cir. 1996) ("De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are."). A court should "only overturn an agency's determination that an offeror's [proposal] satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious." <u>Blackwater</u>, 86 Fed. Cl. at

---

[9]     The court also rejects plaintiff's argument that the agency "waive[d] the requirement that offerors submit a technically compliant proposal." Pl.'s Resp. 13; <u>see also</u> <u>id.</u> at 11 (arguing that "[a]n agency's failure to explain its decision to give a technically acceptable rating to a non-compliant proposal [has been] held to be arbitrary, capricious, and an abuse of discretion" (discussing <u>Naplesyacht.com, Inc. v. United States</u>, 60 Fed. Cl. 459, 471 (2004))). Because the court concludes that Schuyler submitted a technically compliant proposal, plaintiff's argument rests on a faulty premise.

505; Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232, 260 (2010) ("[A]n agency's determination that a proposal is acceptable may be deemed arbitrary and capricious if the proposal did not provide what was called for in the solicitation.").

The parties' arguments center around two material terms contained in the Section 3.B.4 of the PWS: (1) that northbound sailings occur on a "fixed-day-of-the-week," and (2) that departures from GTMO occur, "at a minimum, every 14 calendar days." Tab 15, AR 184; cf. Pl.'s Resp. 6 (characterizing these schedule requirements as "material Solicitation terms"); Pl.'s Mot. 16 (similar).[10]

As detailed above, see supra Part I.B, the narrative portion of Schuyler's technical proposal explains that the EOT Spar, its primary vessel, would "sail[]" from GTMO on Wednesdays. Tab 21, AR 485. Schuyler also provided proposed schedules for both the EOT Spar and its alternative vessel, the Columbia Houston. The proposed schedule for the EOT Spar provided that the vessel would "depart[]" from GTMO on Tuesdays, and the proposed schedule for the Columbia Houston provided that the vessel would "depart[]" from GTMO on Thursdays. Tab 21, AR 486–87.

Plaintiff takes three exceptions to Schuyler's technical proposal:

First, Schuyler failed to commit to a fixed day to depart from GTMO when using [the EOT Spar] (indicating Tuesdays or Wednesdays). Second, Schuyler proposed a different day entirely for GTMO departures when using [the Columbia Houston] (Thursdays). Third, Schuyler's proposed two-vessel solution for performing the Contract violates the Solicitation's requirement that sailings depart from GTMO at least every 14 days (switching from a Tuesday or Wednesday departure every other week to a Thursday departure every other week will necessarily require a 15- or 16-day period between GTMO departures).

Pl.'s Resp. 7–8 (footnotes omitted); see also Pl.'s Mot. 8–9.

Defendant characterizes plaintiff's arguments as "trifling quibbles," Def.'s Mot. 8, and argues that plaintiff simply misunderstands the role that Schuyler's proposed liner schedules played in its technical proposal, id. at 9. Defendant contends that Schuyler's proposed schedules were "sample schedules" that "were not set in stone." Id. In defendant's view, "they contained flexibility and they could be adjusted." Id.

---

[10]    Defendant does not dispute plaintiff's contention that these are material terms of the Solicitation.

Plaintiff counters that its "protest relates to material deficiencies in Schuyler's proposal, which go to the very essence of the liner service requirement." Pl.'s Resp. 2. Plaintiff asserts that the Solicitation required offerors to submit a fixed, not flexible, schedule. See id. at 8–9. Thus, plaintiff claims that Schuyler's "flexible" schedules run afoul not only of the Solicitation but also "the very nature of a liner service contract, which consists of '[r]epeated sailings at regular intervals . . . maintained between the same designated ports.'" Pl.'s Mot. 3 (some alterations in original) (quoting Lane C. Kendall, The Business of Shipping 7 (1973)[11]; see also id. at 4 (advising that, '[b]y definition, a liner service is a regular route on a fixed schedule")); Pl.'s Resp. 6 ("In the context of a liner service contract, a fixed sailing schedule is one of—if not the most important—aspects of contract performance.").

A.      Use of Two Proposed Schedules

The court first addresses plaintiff's contention that Schuyler's "proposed two-vessel solution" violates the Solicitation's terms that vessels depart from GTMO on a "fixed-day-of-the-week basis" at least every 14 days. See Pl.'s Mot. 18–19; Pl.'s Resp. 7–8. For the reasons stated below, the court concludes that the agency's determination that Schuyler's technical proposal met the material requirements of the Solicitation was not arbitrary and capricious.

As an initial matter, the court observes that plaintiff does not take issue with the fact that Schuyler proposed two vessels. See Pl.'s Resp. 8 ("TransAtlantic does not contest Schuyler's ability to propose a second vessel . . . ."). Indeed, the Solicitation contemplates that offerors would propose more than one vessel to meet the contract requirements. See Tab 15, AR 140 (instructing offerors to "identify the vessel(s) . . . to be utilized for this contract"). Rather, plaintiff argues that in order to comply with the Solicitation's material terms, "the second vessel must meet the same regularly scheduled service as proposed for the first vessel." Pl.'s Resp. 8; see also Pl.'s Mot. 8 ("[O]fferors could have proposed multiple vessels so long as each vessel departed Jacksonville and GTMO on the same 'fixed-day-of-the-week' . . . ."). However, reading both the Solicitation and Schuyler's proposal as a whole, the court finds that Schuyler's use of slightly different schedules for its primary and back-up vessels was not inconsistent with the material terms of the Solicitation. That is, the fact that Schuyler's proposed schedules for the EOT Spar and Columbia Houston have different northbound sailing days does not run afoul of the Solicitation's schedule requirement that northbound sailings take place on a fixed-day-of-the-week. Nor does the fact that more than fourteen days may pass

---

[11]      The Business of Shipping is attached as Exhibit 1 to plaintiff's memorandum in support of its motion for judgment on the administrative record. ECF No. 9-1.

between northbound sailings when both the EOT Spar and the Columbia Houston are
used in succession run afoul of the Solicitation's requirement that the frequency of the
sailings occur at least every fourteen days.

As defendant correctly observes, Schuyler's proposed schedules for both the EOT
Spar and the Columbia Houston "individually met the departure, arrival, and transit
requirements specified in the [S]olicitation." Def.'s Reply 3. Each proposed schedule
provided for northbound "[s]ailings . . . on a fixed-day-of-the-week basis" to occur "at a
minimum, every 14 calendar days," with a maximum transit time of eighteen days, as
required by the plain language of Section 3.B.4 of the PWS. See Tab 15, AR 184. And,
the Technical Evaluation Team clearly concluded as much. See Tab 39, AR 662 (Tech.
Consensus Rpt.) (stating that both the "sample sailing schedule [for the] EOT Spar" and
the "sample backup vessel sailing schedule for [the] Columbia Houston" met the
requirements of Section 3.B.4 of the PWS); see also Tab 80, AR 1410 (Ellis Decl.)
(stating that "Schuyler's proposed schedule for both the EOT SPAR and [the Columbia
Houston] was identified and discussed" by the Technical Evaluation Team).

Schuyler stated that its ability to offer two vessels capable of meeting the
Solicitation's sailing requirements would ensure "[f]lexibility and reliability" and
"continuous operation" of service. Tab 21, AR 485–86. Schuyler clearly identified the
EOT Spar as its primary vessel and the Columbia Houston as a second, alternative vessel,
to be used "as required to [e]nsure uninterrupted service to GTMO." Id. at AR 460, 465;
see also id. at 383 ("Our offer proposes the MV EOT Spar as [the] primary vessel for the
liner service."); cf. Pl.'s Mot. 9 (acknowledging same). There is simply no support for
plaintiff's contention that "Schuyler proposed to perform the [c]ontract using two
different vessels with two different schedules interchangeably." Pl.'s Mot. 3.

To be clear, the court rejects plaintiff's argument that Schuyler's proposal allowed
it "unilateral discretion to switch vessels—and therefore schedules—at whim." Pl.'s
Resp. 8 n.5; see also Pl.'s Mot. 20 (attempting to characterize Schuyler as a "bus
company [that] does not provide bus riders with any information as to which bus will be
running at any given time, thus rendering the two different schedules essentially useless
for planning"). The Solicitation requires contractors to "provide and continually maintain
vessel schedules in the Integrated Booking System (IBS) at least 45 calendar days in
advance of the vessel sail date." Tab 15, AR 184; cf. id. at AR 201 (further providing
that "[i]f the Contractor wishes to materially change its service, the Contractor must
submit to the Contracting Officer not later than 60 calendar days prior to the anticipated
change a written request detailing such change and the impact on the service provided").
If the contractor anticipated a change in the vessel schedule, the contractor was instructed
to notify the order officer and update the schedule in the IBS within seven calendar days

prior to the next scheduled port call.  Id. at AR 184.  If the contractor anticipated a "slippage in scheduled sailing date/arrival date by more than one . . . calendar day," the contractor was to report the schedule change in writing.  Id.  Thus, Schuyler could not simply alternate between schedules "at whim."  The Solicitation provides that offerors must provide at least 45 days advance notice of any proposed schedule changes, and nothing in Schuyler's proposal suggests that it sought to do otherwise.

The record reflects that the Technical Evaluation Team viewed the EOT Spar as Schuyler's primary vessel and the Columbia Houston as its back-up vessel.  See Tab 39, AR 662 (Tech. Consensus Rpt.)[12] (referring repeatedly to the "prime vessel" and "backup vessel"); see also Tab 32, AR 630 (Smith Tech. Eval.) (referring to "both the primary and alternative vessel").  The record also reflects that the Technical Evaluation Team acknowledged that the Columbia Houston would be used only if the EOT Spar was unavailable.  Tab 34, AR 638 (Hagan Tech. Eval.) (stating that "[t]he additional availability [of the Columbia Houston] should ensure [un]interrupted service between JAX/GTMO in the event the primary vessel is unavailable").  The court finds reasonable the agency's view that Schuyler's proposed schedule for the Columbia Houston, as a backup vessel, would be used only if the EOT Spar was unavailable.  See Motor Vehicle, 463 U.S. at 43 (stating that the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

Because Schuyler's proposed schedule for its primary vessel clearly meets the material requirements of the Solicitation, Schuyler's submission of a back-up schedule for the Columbia Houston—which differs slightly from that of its primary vessel, but also meets the material requirements of the Solicitation—does not mandate a conclusion that the agency should have rated Schuyler's technical proposal as unacceptable.  Accordingly the court will not overturn the agency's determination that Schuyler's technical proposal met the material requirements of the Solicitation.  See Blackwater, 86 Fed. Cl. at 505 (stating that a court should "only overturn an agency's determination that an offeror's [proposal] satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious"); cf. Tab 15, AR 143 (stating that a proposal would be assigned an acceptable rating if it "clearly meets the minimum requirements of the solicitation").

      B.     EOT SPAR Northbound Departure Discrepancy

---

[12]     The court observes that the Technical Consensus Report on Schuyler's schedule sub-factor is adopted verbatim from the Technical Evaluation of the Chairperson of the Technical Evaluation Team, Randy Ellis.  Compare Tab 39, AR 662 (Tech. Consensus Rpt.), with Tab 33, AR 636 (Ellis Tech. Eval.).

The court now turns to the discrepancy between Schuyler's narrative, which states that the EOT Spar would "sail[]" from GTMO on <u>Wednesdays</u>, and its proposed northbound schedule, which states that the EOT Spar would "depart" from GTMO on <u>Tuesdays</u>.  Tab 21, AR 485–86.  Plaintiff contends that, "[t]his facial ambiguity alone demonstrates the arbitrary and capricious nature of the Agency's acceptance of Schuyler's technical proposal."  Pl.'s Mot. 8.  "To the extent the proposal reserves a right to depart on either day," plaintiff argues, "it violates the [Solicitation] requirement that sailings be on a 'fixed-day-of-the-week.'"  <u>Id.</u> at 17.

Defendant maintains that no discrepancy exists between Schuyler's narrative and the EOT Spar sample schedule.  <u>See</u> Def.'s Mot. 8; Def.'s Reply 4 n.1.  According to defendant, "[d]eparting a port is different than sailing on a voyage; Schuyler's proposal demonstrated that it would leave port on Tuesday evening, and commence 'sailing' at sea the next day."  Def.'s Mot. 8.  However, defendant neither cites to, nor does the record reflect, any support for this position.  Accordingly, the court rejects this argument.

Defendant argues in the alternative that Schuyler's narrative explicitly included "a 10% weather factor," and observes that "[t]en percent of a 14-day journey is approximately a day and a half—the difference between the narrative and [the EOT Spar] sample schedule[]."  Def.'s Mot. 8.  While this may well be a reasonable explanation for the discrepancy between Schuyler's narrative and its proposed schedule for the EOT Spar, it is not one that the court can attribute to the agency.  And "[a] court may not accept counsel's <u>post hoc</u> rationalizations for agency action, but must find support for the agency's action in the decision of the agency itself."  <u>Williams v. United States</u>, 116 Fed. Cl. 149, 159 (2014) (citing <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 50).

As discussed above, <u>supra</u> Part I.A, the Solicitation instructed offerors to submit a written narrative for the schedule subfactor that was to "demonstrate the offeror's understanding of the requirements identified in the [PWS]."  Tab 15, AR 141.  The Solicitation also instructed offerors to submit "a proposed liner schedule that meets the departure, arrival and transit requirements as specified in Section 3.B.4 of the PWS."  <u>Id.</u> at AR 140.  The Solicitation advised that the agency would evaluate the technical capability factor by examining the "the degree to which the information provided by the offeror in its proposal demonstrates the offeror's ability to provide the equipment and resources needed to successfully accomplish the objectives of the [PWS], as well as manage, supervise, and perform the required services in accordance with the PWS."  <u>Id.</u> at AR 143.

The Solicitation did not require offerors to submit a contractually binding liner schedule.  Rather, the Solicitation required offerors to submit a "<u>proposed</u> liner

schedule." Id. at AR 140 (emphasis added); see Am. Heritage Dictionary 1406 (4th ed. 2000) (defining "propose" to mean "[t]o put forward for consideration, discussion, or adoption; suggest"); cf. Bortone v. United States, 110 Fed. Cl. 668, 678 (2013) ("Dictionaries can serve as the basis for determining the plain meaning [of a term]." (citing Fed. Exp. Corp. v. Holowecki, 552 U.S. 389, 408 (2008)). Moreover, the Solicitation advised that "[t]he [g]overnment reserve[d] the right to . . . incorporate all, part or none of the offeror's written proposal in to the resultant contract." Tab 15, AR 137; see Banknote, 365 F.3d at 1353 (Fed. Cir. 2004) (stating that the court "must consider the solicitation as a whole, in a manner that harmonizes and gives reasonable meaning to all of its provisions"). Thus, the Technical Evaluation Team's treatment of Schuyler's proposed schedule as a "sample" schedule comports with the terms of the Solicitation. See Tab 39, AR 662 (Tech. Consensus Rpt.) (referring to the "sample sailing schedule [for the] EOT Spar"); cf. Def.'s Mot. 9 (claiming that Schuyler's "sample schedules . . . were not set in stone").

Per the Solicitation instructions, Schuyler submitted a written narrative describing the EOT Spar's sailing schedule and a "[s]ample" schedule for the EOT Spar. Tab 21, AR 486. Schuyler's "[s]ample" schedule met the material requirement in Section 3.B.4 of the PWS that "[s]ailings shall be on a fixed-day-of-the-week basis," Tab 15, AR 184, and Schuyler's narrative clearly "demonstrate[d] [Schuyler's] understanding of the [PWS] requirements," id. at AR 141. The court finds nothing arbitrary and capricious about the agency's determination that Schuyler's technical proposal met the material terms of the Solicitation. The record simply does not support plaintiff's contention that the discrepancy in departure dates between Schuyler's narrative and the sample schedule of the EOT Spar was an attempt by Schuyler to "reserve[] a right to depart on either day." Pl.'s Mot. 17.

The record reflects that the Technical Evaluation Team neither addressed nor acknowledged the discrepancy in Schuyler's proposal. However, in light of the fact that the Solicitation did not require contractually binding liner schedules—and in light of the fact that Schuyler's written narrative and proposed schedule individually complied with the Solicitation—the court finds this discrepancy to be, at most, a de minimis error in Schuyler's proposal. See Grumman Data Sys. Corp., 88 F.3d at 1000 ("De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are."); E.W. Bliss, 77 F.3d at 449 ("[W]here a defect in a [proposal] is trivial or a mere formality, not material, the [proposal] is not required to be rejected out of hand" (quoting M.W. Kellogg Co., 10 Cl. Ct. at 26)). Thus, to the extent that "the evaluators excused, waived or ignored this discrepancy," as plaintiff alleges, see Pl.'s Mot. 17, the court finds that the agency did not abuse its discretion in doing so, L-3

Commc'ns, 87 Fed. Cl. at 664 ("The court gives great deference to an agency's technical evaluation of an offeror's proposal.").  And, to the extent that the evaluators entirely failed to recognize its existence, the court considers this failure to be insufficient grounds for disturbing the agency's award to Schuyler.  In sum, the court concludes that the agency's determination that Schuyler's technical proposal met the minimum requirements of the Solicitation was not arbitrary and capricious.  See Blackwater, 86 Fed. Cl. at 505 (stating that a court should "only overturn an agency's determination that an offeror's [proposal] satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious"); cf. Tab 15, AR 143 (stating that a proposal would be assigned an acceptable rating if it "clearly meets the minimum requirements of the solicitation").

IV.     Conclusion

        Further to the foregoing, and based on a thorough and careful review of the record, the court concludes that the agency rationally rated Schuyler's technical proposal as acceptable.  Plaintiff's motion is therefore **DENIED**, and defendant's motion is **GRANTED**.  The Clerk of Court shall enter judgment for the government.  No costs.

        IT IS SO ORDERED.

                                        s/ Patricia E. Campbell-Smith
                                        PATRICIA E. CAMPBELL-SMITH
                                        Chief Judge